30078. HARRELL *v*. THE STATE.

DECIDED JUNE 8, 1943.

*J. P. Knight, L. A. Hargreaves,* for plaintiff in error.

*H. W. Nelson, solicitor-general,* contra.

GARDNER, J. Dan Harrell was tried on an indictment charging murder. The jury returned a verdict of voluntary manslaughter. A motion for new trial was overruled, and the defendant excepted. He insists that the evidence is insufficient in law to sustain the verdict, and that each of his two special grounds is meritorious and demands a reversal of the case.

The evidence is lengthy, and in most particulars conflicting as between the contentions of the State and of the defendant. The killing occurred in the defendant's place of business where he operated a dance-hall, café, and drinking establishment. In the afternoon the deceased entered the place "soggy drunk." He had been on a drunken rampage, engaged in a number of difficulties with various people, cutting and molesting them with pocket-knives with which he was armed. Soon after he entered the establishment of the defendant the policeman of Willacoochee, at the instance of some one (not the defendant), arrested the deceased and took from him two knives. On the way to the jail the deceased made his getaway from the policeman,

and some time thereafter returned to the place of business of the defendant. The evidence reveals that during the afternoon and before the killing occurred, both the deceased and the defendant threatened to kill each other, and that "hot blood" arose between them. We relate a part of the testimony of the State, in order to illustrate whether or not there is any merit in the contention of the defendant, in so far as the general grounds are concerned, and as further bearing on the first special ground of the motion.

Mary Newbern, an employee of the defendant, testified in part: Defendant Harrell shot Wilbur Moore, the deceased, when defendant took the pistol out of his pocket. "He reached in his hip-pocket and got it out of his hip-pocket. Wilbur didn't have anything in his hand; he wasn't doing anything but hold him. . . I saw Wilbur fall, I went back in after he was shot down. I touched him first. He just fell straight back with his hands out, face up; he didn't have anything in the way of an instrument about his person. . . Wilbur said: 'Mr. Harrell, you have already had the law on me one time to-night,' and Mr. Harrel hit himself in the chest and says, 'I am law enough for you.' He [defendant] stayed in the back, back there drinking; he was drunk. . . Mr. Harrell had been drinking ever since Thursday, just drinking off and on until Saturday. . . Herbert Cato and Mr. Harrell and Bill Altman had been drinking all afternoon together back there in the back end."

Georgia Ada Strange, an employee of the defendant, testified for the State: "When Wilbur came in about ten o'clock he did not have anything in his hand that I know of. He came in about twelve o'clock, and I would say he was practically sober, because he had pretty good sense. When Wilbur came in he had a pool stick and handed it to John Youmans. . . they walked on around in the back. . . Wilbur asked me about who had gotten a warrant for him, and what was the trouble about. . . He said: 'I believe Dan [defendant] did.' And I said: 'No, I don't think Dan did.' He said: 'Yes, I believe Dan did,' and started eating his hamburger. Dan and Bill Altman and Herbert Cato . . were in the back, drunk. . . Dan was tight—drunk. . . Wilbur had both hands on his (Dan's) left arm. . . I don't know what taken place. Wilbur did not have anything in his hand."

Reuben Futch, for the State, testified: "We (Wilbur and Futch) went in there to get something to eat, and ordered what we wanted, and they fixed it and brought it out, and Wilbur told me he would be back in a minute, he said he was going to walk back there and talk with John Newmans; and they walked back to the back and started to talking to Georgia Ada Strange. I could see them from where I was at the table; they didn't talk there but just a few minutes; they came to me and told me to go back there and get Wilbur out, that there was going to be trouble. I don't remember who it was told me, but it was a woman. I went back there. I could hear trouble back there. I did not know Dan was back there at the time; when I got to the door I saw Wilbur. I didn't see Dan. I saw Wilbur and these two boys from Douglas, Altmans I think, and I don't know the other boy's name; these two boys were standing over by the Jook organ, talking, and Wilbur was standing on the right as you go in at the door going in at the back, and Dan was standing back up in the corner as you go in the door; looked like as close as he could get; they were facing each other, about five foot apart. I walked on over to the boys from Douglas to talk to them, and glanced back, and Wilbur went towards Dan and grabbed his arm with both hands. I didn't understand what they were saying before that happened; they wasn't talking when I walked in; the only thing I heard when I started towards those two boys from Douglas, Wilbur told Dan not to get so hard-boiled about it, and went to him and caught his arm. Dan said he was law enough for him. Wilbur told him not to get so hard-boiled about it. Wilbur had no weapon whatsoever. Wilbur caught hold of him with both hands—his left arm; when he caught hold of him Dan was already practically out with his gun, and I started towards them, and he went to shooting and shot Wilbur; when he went to shooting Wilbur went to fighting the gun, trying to get hold of the gun. Dan fired four shots. Wilbur caught hold of Dan's left hand. Dan reached down with his right hand and got his gun, and Wilbur started fighting the gun. Dan was holding the gun down like this [illustrating], and Wilbur was trying to get hold of the other arm and was going back and to like that. Wilbur fell about the same time I did, I got shot in the leg. I don't know how close I was to Wilbur, but I had started towards him

to try to stop him, to try to get the gun. I did not become unconscious. I did not fall where he hit me, but I was about eight foot the other side [from] where he hit me, from Wilbur and Dan; they were both standing together. Wilbur had hold of him. I staggered back and fell. Wilbur had nothing at the time he was killed to do anything to Dan with; he did have something that day, pocket-knife; Mr. Guthrie got it. I don't know whether Dan knew that or not, and Wilbur had a billiard cue, but he did not carry it in the back. Wilbur gave the cue to John Newmans, and John came and sat it in the front as you go in the back door. Wilbur did not do anything; we were standing up there talking, four or five of us, Rudolph Metts and I don't remember who else; we went in there to get something to eat, got it, but we didn't eat it; it was just a few minutes after we went in there when Wilbur had the cue and turned it over to Mr. Newmans until the fatal shooting occurred in the rear. I don't know exactly how many; at that time Wilbur was sober, he hadn't drunk none in three hours. Dan Harrell was drunk; he wasn't down; he could walk. I had seen him drink, don't know exactly how many times. I did not observe anything special about his clothing. I had been in the café off and on all day; there had been drinking there in that café that day. I saw Dan and these two boys from Douglas go back there a good many times and take drinks . . ."

The defendant introduced testimony to the effect that at the time of the shooting the deceased was advancing toward him with a knife, and he shot the deceased in self-defense. He made a statement to the same effect. Under the State's view of the case as revealed by the evidence, the verdict was authorized. The jury were the sole judges as to the credibility of the witnesses. They chose not to believe the witnesses for the defendant, or his statement. They resolved the issue against the defendant. The verdict has the approval of the trial court, and this court is without authority to arbitrarily set it aside, under the facts of this case. The exceptions under the general grounds of the motion are without merit.

■ Ground 1 of the amendment to the motion assigns error on an excerpt from the charge of the court, to wit: "Now, gentlemen of the jury, the court charges you further that voluntary drunkenness furnishes no excuse for crime." This charge is at-

tacked as erroneous, (a) because in effect it was a declaration of the court to the jury that movant was claiming drunkenness as a defense, whereas movant's sole and only defense was that he was acting in his own defense with his full mental faculties as to what he was doing, and that the charge influenced the jury to consider that defendant was excusing himself for his conduct of shooting on the ground of drunkenness; and (b) because the language constituted an expression of an opinion that the crime had been committed by defendant, and that defendant was undertaking to defend against it upon the excuse that he was drinking and did not know what he was doing; and that the charge prejudiced the minds of the jury against defendant and influenced their verdict, since there was no evidence to support such contention, and nothing in the defendant's statement to support such contention.

The evidence as set forth above discloses that both the deceased and the defendant were drinking and drunk. The Supreme Court in a case similar to the one before us has settled the case adversely to the defendant. In *Dickens* v. *State*, 137 *Ga.* 523, 528 (73 S. E. 826), the court said: "Another ground of alleged error is because of the judge's charge on the subject of drunkenness, which was as follows: 'On the subject of drunkenness, I charge you that drunkenness is no excuse for crime. One who voluntarily and intentionally kills must meet the demands of the law with some other excuse than that of drunkenness. To be too drunk to form the intent to kill, the slayer must be too drunk to form the intent to shoot. Still, I charge you that if the defendant was drunk when he fired the fatal shot which took the life of Roseberry, you may consider this, like any other fact, to illustrate his intent and motive and otherwise to shed light upon the transaction.' In a note appended to this ground of the motion, the judge trying the case says: 'The sole defense was self-defense, and justifiable homicide under the distress of the fears of a reasonable man, and accident. The statement shows these defenses were set up, and in addition in this statement the defendant denied that he was drunk, and the evidence on the part of the State fails to show that he was drunk—that he had taken a couple of drinks before the killing.' The brief of evidence sustains the judge in the note just quoted, with reference to the testimony and the statement of the accused. Nor do we think the

charge complained of was erroneous as against the defendant, especially in view of the statement of the defendant himself, who claimed that he was not drunk." Since the evidence shows that both the deceased and the defendant were drunk, the charge was pertinent and applicable to the theory of both the State and the defense.

■ Special ground 2 in effect complains that the court went into detail in the charge on voluntary manslaughter, as follows: "Now, gentlemen, if you do not convict the defendant of murder, and if you should convict him of the lesser offense of voluntary manslaughter, it would then become your duty to fix the punishment that the defendant would receive, by fixing a minimum and a maximum penalty within the limits prescribed by the law for that offense, those limits being not less than one year nor more than twenty years in the penitentiary. In other words, gentlemen, the law fixes as a minimum one year, and twenty years as a maximum, as the penalty for voluntary manslaughter. You would have the right, in the exercise of your discretion, to fix the punishment at any length of time you may see fit to fix it, provided you did not fix it at less than one nor more than twenty years. Now you may, if for any reason you should see fit to do so in the event of a verdict of guilty, fix the minimum and the maximum penalty at one and the same thing; or you may fix the minimum and the maximum term of service at different lengths of time. Now, just to illustrate, and without expressing or intimating to you any opinion as to what you should find or fix in the way of punishment, and this, now, is just for the purpose of illustration only: In the event of a verdict of guilty of voluntary manslaughter you may fix the minimum and the maximum as fixed by law, if you should desire to fix it that way; that is, not less than one nor longer than twenty. And now, just to illustrate further, you may fix it not less than five nor more than ten; and to illustrate further, you may fix it not less than ten nor more than twenty; and to illustrate further, you may fix it not less than ten nor more than ten; and to further illustrate, you may fix it not less than twenty nor more than twenty; and to further illustrate, you may fix it not less than one nor more than one; and to further illustrate, you may fix it not less than one nor more than two. In other words, you have the discretion to fix the length of time

at any length of time you may see fit to fix between the minimum of one and the maximum of twenty, as fixed by law. So long as you stay within those limits you are staying within the law. But, as stated, you are required to fix both a minimum and a maximum term of service in fixing the punishment in the event of a verdict of guilty; but, as already stated, you may fix that at different lengths of time, or at the same period of time, if you want to. . . The form of a verdict convicting the defendant of voluntary manslaughter would be, 'We, the jury, find the defendant guilty of voluntary manslaughter, and we fix his punishment at not less than (so many years) nor more than (so many years), in the penitentiary,' fixing, as already stated, a minimum and a maximum penalty within the limits prescribed by the law, not less than one nor more than twenty years. . . The form . . in the event of a conviction of the defendant of the offense of murder, . . 'We, the jury, find the defendant guilty,' or 'We, the jury, find the defendant guilty, and recommend him to the mercy of the court.'" The charge given to the jury with respect to acquittal or a verdict of not guilty is: "If the jury should have a reasonable doubt as to the defendant's guilt of the offense of murder, or of the offense of voluntary manslaughter, it would be your duty to acquit the defendant, and the form of that kind of verdict would be, 'We, the jury, find the defendant not guilty.'" Complaint is made that this charge tended to impress the jury with the idea that in the opinion of the court the defendant was guilty of voluntary manslaughter. The charge as a whole is full, clear, and correct. We can not see how the jury could possibly have got the idea that the court was expressing his view as to the verdict the jury should return. This ground is without merit when we consider the charge as a whole, or even the excerpt alone. The judge did no more than define manslaughter, give the jury the penalty therefor, advise them as to the form of their verdict, and the effect of their verdict in the event they should find the defendant guilty of voluntary manslaughter. He particularly charged the jury elsewhere that it was for them to say what their verdict should be, under the evidence and the law which the court gave in charge, and the court expressed no opinion as to what their verdict should be.

The court did not err in overruling the motion.

*Judgment affirmed. Broyles, C. J., and MacIntyre, J., concur.*