1. "A conviction may be lawfully had upon a free and voluntary confession though the same be not otherwise corroborated than by proof of the corpus delicti." Wimberly v. State, 105 Ga. 188 (31 S.E. 162).
2. Here the evidence authorized a finding that there was a free and voluntary confession; and the confession was corroborated, not only by proof of the corpus delicti, but also by other circumstances among which was the identification, by the victim of the assault with intent to rape, of the defendant as the person who committed the same upon her.
3. The evidence authorized the verdict.
 DECIDED MAY 20, 1948.
The defendant, E. C. Largin, was indicted and convicted of assault with intent to rape. He made a motion for a new trial on the general grounds only. This motion was overruled and to this judgment he excepted.
The victim of the alleged assault with intent to rape testified on direct examination: "I am now twelve years old. I go to Humphries School at Orchard Knob, and went to school there last November. I saw this boy right here [referring to the defendant] that afternoon [November 20, 1946]. I don't know his name. I saw him when he got me on Brown Mill Road. I had my book satchel and books. This man was driving a light green automobile. He said, `Get in and shut up,' and I got in. I ran to get in a driveway but I didn't get to the driveway. He put me in the car and started out. I said I didn't want to ride and he said, `Shut up.' Then he made me slip over next to him and put my books on the other side. He got vaseline out of the pocket and put it on my privates and made me lie down in the car — told me to lie down and put vaseline on me. He drove over there close to the school; all around the block. He did not put any of this vaseline on hisself. After he put this vaseline on me he sucked my privates. That was down below the schoolhouse. Before that he put his hand under my dress. After that we went on down the road and turned up the dirt road. I don't know the name of the road we stopped on first; it is close to the schoolhouse. I don't know the name of the road we stopped on the next time — the dirt road. I showed the two officers the roads out there. When he got on the dirt road he stopped his automobile again. I couldn't get out of the car when he first picked me up because he didn't have any handle on the door. On the second stop, on the dirt road, he done put his mouth on my privates. He never got out of the car. I saw his private parts. Then he told me to get up on his lap, set on it; I don't know why and he didn't tell me why. I told him, `No,' and he just said, `Shut up.' Then he opened the door and let me out. I looked around and ran down the road and come to Mrs. Dykes' house and told her to call mother. I was crying then. I fell on the porch step. My father came after me. The first and second time he stopped he put his private parts between my legs. I saw the officers when they came up to the house. I don't know when they were *Page 113 
called. I think Mrs. Dykes' sister called them. I don't know when it was I went with the officers to show them where all this occurred. My father went with me and the officers on this trip. The upholstering was torn around the handle. I don't know what type of automobile it was. I told the officers about the condition of this door of the automobile."
On cross-examination she described the locality in which the defendant picked her up and the route he took on the occasion in question and testified further: "He [the defendant] was on the opposite side of the street from what I was on. . . He said, `Come here.' I said, `No.' He said, `Come, here and shut up.' . . I cross the road. . . He was fixing to stop the car. I guess I was scared because he talked so smart — he told me to get in and shut up. . . I don't know what made me run across Brown Mill Road to get in the car. . . I told the police officer who came out there that afternoon, when I was describing the man, the kind of clothes he was wearing, I told them how old I thought he was, and how tall I thought he was and what he looked like. . . When I was telling the two uniformed officers that came out there that afternoon how this man looked and how old he was I saw them writing down what I said, and my father was there at the time. I told the officers at that time that the man that picked me up was between thirty and thirty-five years old. My father is thirty-eight. The man that picked me up didn't look quite as old as my father. . . Two officers showed me some pictures up at the police office. . . I didn't identify anybody from those pictures here at the courthouse. Later some officer had a picture out at the schoolhouse. . . I saw one picture that I thought looked like the man that picked me up. [This picture was not the defendant.] . . I remember at the time that I rode in the defendant's automobile that the handle was of the door on the right-hand side." She identified a picture of he inside of the car of the defendant as being the car in which he picked her up on the occasion in question and identified a picture of the inside of a right-hand automobile door, which showed the upholstering torn and which had the handle missing, as being that of the car in question.
Upon the child being released from the car, she, nervous and *Page 114 
crying, went to a neighbor's house and told what had happened to her. The neighbor notified the child's father who came and took her in his arms, carried her home and sent for the mother. Both the father and mother said that she was crying and nervous. The mother examined the child and found vaseline upon her private parts as stated by the child in her testimony.
Lieutenant J. W. Gilbert of the Fulton County Police Department, who was sent to investigate the assault with intent to rape, stated that he carried the child to Grady Hospital for examination, and testified: "She was nervous and upset. . . She said there was a man in a faded out green automobile or old automobile had picked her up at the corner of Cleveland and Brown Mill Road and we took her with her father in the car. She showed us the route he had taken, out Brown Mill to McWilliams Road, out McWilliams Road to Jonesboro Road, back Jonesboro Road to Orchard Knob and back by her schoolhouse, and stopped about one hundred yards below the school. I asked her what he did. She said he put vaseline on her and put vaseline on hisself; that he tried to set her down on his privates and tried to push it in her. . . The little girl told us the color of his hair as dark, sandy hair. She was excited and I tried to get the best description I could. He had on army pants but she wasn't certain about the shirt. She said he was driving an old dilapidated green automobile. . . . We had a lookout put out for a dark brown-haired man. She said dark brown or sandy hair. . . [She] said it was combed straight back, I think."
Miss Judy Jones, sworn for the State, testified as follows: "I am eleven years old. [On or about December 1, 1946,] a grown man offered me and group of other little girls two dollars to come there. That was out near Judge Moore's old home. It was just a little dirt road we were playing on. I see that man in the court room that said something to us — the red-head right there [referring to the defendant]. This was in the afternoon. He was driving a dark green car. He didn't have his car with him. He came out of the woods as we left and followed us on this dirt road a little piece. He offered us two dollars to come there, and I wasn't quite sure about what he said to us, except that he offered us two dollars and said something about working or coming there or something. I didn't do anything when he offered *Page 115 
us the two dollars. The little ones wanted to go there and I wouldn't let them. I made them go home. None of the children went to him when he offered them two dollars. One went a little piece and I made her go back. He dropped some of the money on the ground. He was quite a fur piece from us. I saw some police officers out there that day. They were turning around on the end of the road when he was talking to us and they stopped us when we got almost home and we talked to them. This defendant ran off in the woods when he saw them, at least he walked off. I didn't see whether he went back to his automobile or not. . . There were about five other children there. [One 9, one 7, one 5, one 3, and one 2 years old.] We were all together. The defendant never got any closer to us than the back of this courtroom at any time. . . I identified this defendant when I saw him in the custody of the police officers."
On December 1, 1946, following the incident above testified to by Judy Jones, the defendant was immediately carried to the County police office, and was questioned by Captain of Detectives P. F. Bradford of the Fulton County Police, together with Lt. Perry, in regard to this occurrence and in regard to the transaction of November 20, 1946, the assault with intent to rape here in issue. Captain Bradford, sworn and on the witness stand, said: "He [the defendant] started crying, and he said he didn't know what was the matter with him. He said he guessed he was crazy. Then he told us he had been on a job out here in Hapeville and was helping his uncle; and he had left the job out there and was going down town over on Peters Street to get some supplies. He said he was driving a 1937 green Ford. He told us that he . . noticed this little girl walking on Brown Mill Road . . and said he pulled up side of her and tried to get her in and she finally got in. He told us [the route he had taken on the occasion in question and that when he got on the] dirt road. . . he was loving the little girl up. . . He said he had a bottle of vaseline in the car and he said he used the vaseline on his penis and tried to penetrate the girl but never did accomplish it. He told us about holding his hand over on her private parts and discharging himself. Then he said that after he had done this then he put his mouth to her. He said he had *Page 116 
been doing this for some time; that on numerous occasions that he had picked up little girls and had taken them to the Botanical Gardens off Gordon Road."
Several days later, on December 1, 1946, the defendant went with Officers Adams and Hay of the Fulton County Police and showed them the route he had taken on the occasion of November 20, 1946, and the two places at which he had stopped in the commission of the crime here charged. Upon their return to the police station in the presence of Chief of Police Mitchell, Lt. Jordan, and Officers Adams and Hay, the defendant made a confession which was reduced to writing, typed and signed by him. This confession was introduced in the evidence after the witnesses thereto had testified that it was freely and voluntarily given without hope of reward or benefit or the remotest fear of injury. This written confession was as follows:
"Fulton County, Georgia, December 1, 1946.
"Statement made by: Edwin Clair Largin, white, male, age 19, of 941 Capitol View Ave., N.W., Atlanta, Georgia:
"I have made this statement of my own free will and accord and without any fear or promise of reward, and have been notified by the officers that this statement may be used in court against me.
"I was working on Georgia Ave., and Atlanta Ave., in Hapeville, Ga., with my dad, doing plumbing jobs. This was about a week and a half, two weeks ago, and about 2 or 3 o'clock I left the job to go after some material, at Horne Wilson's on Peters St. I was driving a 1937 Ford, tudor Sedan, Color green, Lic. No. A-38522. I decided that I would ride around before I went for the materials, so I drove through Hapeville, and down the 41 Highway till I came to Brown Mill Rd., where I made a left turn into Brown Mill Rd. I continued on Brown Mill Rd. near Cleveland Ave., where I saw a little girl walking up the road, Brown Mill Rd., going the same direction as I was going. I stopped along beside of her and asked her if she wanted to ride. After asking her two or three times she came over to the car and asked me what did I say, and I again asked her if she wanted to ride. She then opened the door and got in. I then drove out on Brown Mill Rd. to McWilliams Dr. to Jonesboro Rd., and turned to the right on Jonesboro Rd., toward Orchard *Page 117 
Knob to School Rd., where I made a right turn on to School Road to Humphries Dr., to Springside Dr., and made a left turn on Springside Dr. and continued out Springside Dr. across Brown Mill Rd. to the dirt road continuation of Springside Dr., and from there on to the top of the hill where I pulled off to the right side of the road and parked. From the time that the girl got in my car to the time we pulled off the side of Springside Dr. and parked I was playing with her. This little girl did not have on any pants and I had some vaseline in the glove compartment of my car, and I got it and I took some of the vaseline and took my penis out and put some on it, and tried to put it in the little girl's privates, but could not get it in. Two or three times she told me not to hurt her, and I told her I was not going to. I got out of the car and went around on the right side of the car and opened the door where she was sitting and told her to lay down, and she did, but asked me not to hurt her, and I told her that I wouldn't. While standing by the side of the car I held my hand on the girl's privates and jacked off with my other hand. I tried to get her to play with my privates before this and she slapped me several times. I asked her to to play with my privates, and she asked me if they would hurt her, and I told her no, so she played with them for awhile. While I was standing on the ground beside the right side of the car with the door open and while she was lying on the seat I went down on her two times by putting my tongue down around her legs and thighs and after that I fastened up my clothes and got back in the car and drove to the next dirt road and turned around and went back out Springside Drive and made a left turn at Brown Mill Rd. and drove up Brown Mill Rd. a little ways and stopped and she got out. I drove on back around by South Pryor Rd., near Lakewood Park, and went up on Peters St. to Horne Wilson's place and got the plumbing materials. Then I went on back to the job.
"I have been doing this type of thing for about a year and a half and I would say that I have picked up about 25 girls, ranging from 12 to 17 years of age. I have picked up one girl on Glenn St. near Stewart Ave., and picked the same girl up again at Kirkwood on Boulevard Dr. I have picked up several on Gordon Rd. beyond Mosley Dr. and carried them to Botanical Gardens. *Page 118 
"Today, I parked my car on Moore's Mill Rd. and was wiping the dust off with a rag, when I hear children playing down the road aways, so I walked down to the dirt road and saw them, several small girls ages ranging from three to 11 years of age, so I holloed at them and asked them where the creek was and they did not answer me. Then I told them to come here and I would give them $2.00. They didn't come to me so I turned around and started back toward the car and got back to the car, and the police drove up to the car and asked me who the car belonged to and about my driver's license and registration for the car. They then left and I started on toward home and just as I turned on to Marietta Rd. another police car stopped me and carried me back to meet the lieutenant who had stopped me the first time. When we meet him they brought me in to the Fulton County Police Office.
"Later on in the afternoon two of the County Detectives (Adams Hay) went with me and I showed them where and the way I went when I picked the little girl up on Brown Mill Rd. The Detectives told me the names of the roads that I showed them I traveled and where I parked.
"For the last six or seven years, I have been having spells of some kind and do things that I did not know anything about. These spells come on me every week or so.
"I have made the above statement of my own free will and accord and it is the truth and nothing but the truth, so help me GOD: Signed: Edwin C. Largin. Witnesses: A. C. Adams, L. C. Hay, C. E. Mitchell. This 1st Day of December, 1946."
The defendant introduced witnesses by whose testimony he sought to prove an alibi.
The defendant sought to prove an alibi, but the jury resolved this issue against him; and under the evidence they were authorized to do so. On this issue and other issues in the case where there were apparent or real issues under the evidence, the credibility of the witnesses is solely within the providence of the jury. Harrell v. State, 69 Ga. App. 482
(1) (26 S.E.2d 151); Berry v. State, 185 Ga. 334 (3) (195 S.E. 172). As to the *Page 119 
defendant's statement to the jury, denying his guilt and denying that his confession was made voluntarily without the slightest hope of benefit or remotest fear of injury, under our law it is well settled that it is the prerogative of the jury to accept the defendant's statement as a whole, or to reject it as a whole, to believe it in part, or disbelieve it in part. In the exercise of this discretion they are unlimited. Jones v. State, 71 Ga. App. 56,57 (30 S.E.2d 284).
The defendant also contends that a finding by the jury that he was identified as the man who committed the crime was not authorized by the evidence, that not a single statement in his purported confession was corroborated by testimony, and that the verdict finding him guilty is contrary to law and contrary to the evidence.
The trouble with this contention is that the defendant identified himself by his confession, which the jury were authorized to find was freely and voluntarily made, as the man who committed the crime in issue; and the proof that there was in fact an assault with intent to rape upon the little girl about whom the confession was made is undisputed. That fact (proof of the corpus delicti) is enough to corroborate the confession so as to authorize the conviction. Miller v. State, 60 Ga. App. 682
(4 S.E.2d 729). "A conviction may be lawfully had upon a free and voluntary confession though the same be not otherwise corroborated than by proof of the corpus delicti." Wimberly v.State, 105 Ga. 188 (supra).
In the instant case, in addition to the proof of a confession and of the corpus delicti, there was proof of a number of circumstances which tended to show the defendant as the person connected with the crime in issue, not to mention the identification of the defendant as such person by the victim of the assault with intent to rape. The evidence authorized the verdict finding the defendant guilty as charged, and there was no error in overruling his motion for a new trial based on the general grounds only.
Judgment affirmed. Gardner and Townsend, JJ., concur. *Page 120